UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARKET PLATFORM DYNAMICS, INC.,
    Plaintiff,

    v.                                    CIVIL ACTION NO.
                                    11-11386-MBB
SCOTT GRIMES and
CARDLYTICS, INC.,
    Defendants.

**MEMORANDUM AND ORDER RE:
DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
(DOCKET ENTRY # 30)**

**July 23, 2013**

**BOWLER, U.S.M.J.**

Pending before this court is a motion for partial summary judgment (Docket Entry # 30) filed by defendants Scott Grimes ("Grimes") and Cardlytics, Inc. ("Cardlytics") (collectively "defendants").

<u>PROCEDURAL BACKGROUND</u>

On November 7, 2011, plaintiff Market Platform Dynamics, Inc. ("plaintiff" or "MPD") and defendants consented to the filing of an amended complaint pursuant to Rule 15(a)(2), Fed. R. Civ. P. (Docket Entry ## 11 & 12). The amended complaint sets out the following claims: breach of contract (Count One); breach of the implied covenant of good faith and fair dealing (Count Two); violation of Massachusetts General Laws chapter 93A, section 11 (Count Three); quantum meruit (Count Four);

unjust enrichment (Count Five); and declaratory judgment (Count Six).  (Docket Entry # 12).  Plaintiff entered into a stipulation to dismiss Count Three of the amended complaint.  (Docket Entry # 38).

Plaintiff seeks relief for unpaid shares under a consulting agreement, a declaratory judgment that Cardlytics is bound by the consulting agreement and a preliminary and permanent injunction.  (Docket Entry # 12).  The injunctions would bar Cardlytics from issuing shares of stock without holding sufficient shares in reserve to pay MPD's consulting fees "pursuant to the formula described in the Consulting Agreement, and based on a $50,000 fee."  (Docket Entry # 12).

On December 7, 2012, defendants filed the motion for partial summary judgment, a memorandum in support and a statement of material facts under Local Rule 56.1.  (Docket Entry ## 30-32).  On January 8, 2013, plaintiff filed an opposition to the motion as well as its own statement of material facts.  (Docket Entry ## 36 & 37).  On January 22, 2013, defendants filed a reply to plaintiff's opposition.  (Docket Entry # 41).  On February 7, 2013, this court held a hearing and took the motion for partial summary judgment under advisement.  (Docket Entry # 42).

<u>STANDARD OF REVIEW</u>

Summary judgment is appropriate when the record shows
"there is no genuine issue of material fact, and the moving
party is entitled to judgment as a matter of law."  Rule 56(a),
Fed. R. Civ. P.  "A dispute is genuine if the evidence about the
fact is such that a reasonable jury could resolve the point in
the favor of the non-moving party."  American Steel Erectors,
Inc. v. Local Union No. 7, International Association of Bridge,
Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68,
75 (1st Cir. 2008).  "A fact is material if it carries with it
the potential to affect the outcome of the suit under the
applicable law."  Id.

Facts are viewed in favor of the non-movant, i.e.,
plaintiff.  Noonan v. Staples, Inc., 556 F.3d 20, 23 (1st Cir.
2009).  "Where, as here, the nonmovant has the burden of proof
and the evidence on one or more of the critical issues in the
case is not significantly probative, summary judgment may be
granted."  Davila v. Corporacion De P.R. Para La Difusion
Publica, 498 F.3d 9, 12 (1st Cir. 2007) (internal quotation
marks, citation and ellipses omitted); accord Clifford v.
Barnhart, 449 F.3d 276, 280 (1st Cir. 2006) (if moving party
makes preliminary showing, nonmoving party must "produce
specific facts, in suitable evidentiary form, to establish the
presence of a trialworthy issue" with respect to each element on
which he "would bear the burden of proof at trial") (internal

3

quotation marks and citations omitted).  Conclusory allegations
and improbable inferences are not part of the summary judgment
record.  See <u>Chiang v. Verizon New England Inc.</u>, 595 F.3d 26, 30
(1st Cir. 2010) (noting requirement to ignore "'conclusory
allegations, improbable inferences, and unsupported
speculation'" on summary judgment); <u>Triangle Trading Company,
Inc. v. Robroy Industries, Inc.</u>, 200 F.3d 1, 2 (1st Cir. 1999)
(same); <u>see</u>, <u>e.g.</u>, <u>Lopez-Carrasquillo v. Rubianes</u>, 230 F.3d 409,
414 (1st Cir. 2000) (averment that "'Defendant Arcilio Alvarado
actively discriminated against plaintiff [sic] he was
responsible for taking away his responsibilities for
transferring him and was the one who clearly identified
plaintiff as a member of the Popular Democratic Party' . . .
merely repeats the conclusory allegations in the complaint" and
therefore "does not establish a genuine issue of material
fact").

　　　As noted, defendants submit a Local Rule 56.1 statement of
undisputed facts.  Uncontroverted statements of fact in the
Local Rule 56.1 statement comprise part of the summary judgment
record.  See <u>Cochran v. Quest Software, Inc.</u>, 328 F.3d 1, 12 (1st
Cir. 2003) (the plaintiff's failure to contest date in Local
Rule 56.1 statement of material facts caused date to be admitted
on summary judgment); <u>Stonkus v. City of Brockton School
Department</u>, 322 F.3d 97, 102 (1st Cir. 2003) (citing Local Rule

56.1 and deeming admitted undisputed material facts that the
plaintiff failed to controvert).

FACTUAL BACKGROUND

"Cardlytics is an online advertising company that
'enabl[es] advertising offers inside of bank accounts.'"
(Docket Entry # 32, ¶ 1).  "Through the Cardlytics platform,
'banks run offers on behalf of advertisers in customers'
transaction statements targeted against actual card purchases.'"
(Docket Entry # 32, ¶ 1).  Lynne Laube ("Laube") is the
president of Cardlytics.  (Docket Entry # 30-2, p. 3).  Grimes
is the chief executive officer of Cardlytics.  (Docket Entry #
30-2, p. 4).  MPD is a management consulting firm founded by
David S. Evans ("Evans").  (Docket Entry # 30-1, p. 3).  Karen
Webster ("Webster") is the chief executive officer of MPD.
(Docket Entry # 30-3, p. 3).

Beginning in February 2008, Grimes began discussions with
Evans about the prospective formation of Cardlytics.  (Docket
Entry # 36-3, p. 7).  On March 11, 2008, Grimes sent an email to
Webster, copying Evans, in which Grimes restated the terms of
the relationship.  (Docket Entry # 36-5, p. 2).  The email
stated that either Webster or Evans would serve on the
Cardlytics advisory board, that MPD would provide consulting
services for Cardlytics with fees paid in Cardlytics shares,
that MPD would receive 3% revenue for contracts sourced for

Cardlytics, and that MPD would receive 5% of investments in the event it "played a key role in introducing and attracting investments in Cardlytics." (Docket Entry # 36-5, pp. 2-3).

On or about April 6, 2008, Grimes sent an email to Evans with a subject line "MPD Agreements" and a final agreement attached. (Docket Entry # 36-5, p. 5). None of the parties can locate a signed copy of the April 6, 2008 agreement ("consulting agreement") but they acknowledge that the signed copy is not materially different from the unsigned copy dated April 6, 2008. (Docket Entry # 36-7) (Docket Entry # 30-5, p. 12) (Docket Entry # 30-1, p. 19). The unsigned consulting agreement lists SDG Holdings, LLC and MPD as the parties on the first page but lists only "XXX" and MPD on the signature page. (Docket Entry # 30-9, pp. 2 & 7). Grimes explained that the document does not name Cardlytics because Cardlytics was not an entity at the time but there was "certainly the understanding that it was around Cardlytics." (Docket Entry # 36-3, p. 7). Grimes conceded that SDG Holdings, LLC acted as a "placeholder" for Cardlytics in this agreement.[1] (Docket Entry # 36-3, p. 8).

The unsigned consulting agreement contains three schedules that define the compensation, consulting services and

---

[1]  A placeholder is "a section of text that is placed in a document, etc. temporarily until the final text is inserted there at a later stage." Collins English Dictionary, http://www.collinsdictionary.com/dictionary/english/placeholder.

deliverables due under the agreement. (Docket Entry # 30-9). Schedule A states that MPD will be paid in shares of Cardlytics equal to the cash value of the consulting fees. (Docket Entry # 30-9). Schedule B states that any request for "general consulting services" requiring more than 20 hours of work must be comprehensively defined and that "total fees for Schedule B will not exceed $50,000 over the life of the agreement." (Docket Entry # 30-9). Schedule C states the type of information and deliverables that MPD will provide to Cardlytics with the goal that Cardlytics will be able to "better ground the assumptions in its business plan" for potential investors and customers. (Docket Entry # 30-9). Schedule C also stipulates a maximum consulting fee of $50,000 to be "paid as defined by Schedule A." (Docket Entry # 30-9, p. 12).

On May 16, 2008, Grimes sent an email to Evans asking when Evans planned on compiling the "ad data." (Docket Entry # 36-5, p. 6). Grimes later clarified this request stating that Cardlytics was interested in comparing its promotional pricing model to industry standards and averages. (Docket Entry # 36-3, p. 138). Grimes testified that he asked Evans to produce different prices on a spreadsheet but that Grimes never received the requested spreadsheet. (Docket Entry # 36-3, p. 14). In contrast, Evans testified that he and Grimes were in frequent communication from April to June of 2008 and that Grimes knew

that Evans was performing work under schedule C of the consulting agreement.  (Docket Entry # 30-1, p. 22).

Cardlytics was officially incorporated on June 26, 2008. (Docket Entry # 36-8).  Shortly thereafter, on August 7, 2008, Grimes sent Evans a letter ("advisory board agreement") welcoming Evans to Cardlytics' advisory board.  (Docket Entry # 30-4).  In consideration for Evans' role on the advisory board, Evans received an option grant to purchase 1% of Cardlytics stock at $.001 per share at the closing of the Series A financing round with the option vesting monthly over a two year span.  (Docket Entry # 30-4).  Evans and Grimes both signed the advisory board agreement under which Evans agreed to attend advisory board meetings, guide research, evaluate results, introduce Cardlytics to potential investors and allow his name to be listed on the company website.  (Docket Entry # 30-4). Furthermore, Evans testified to having signed a "2008 Notice of Stock Option Grant" with Webster's signature included on the document.  (Docket Entry # 30-1, pp. 13-14).

During the course of 2008 Evans reviewed PowerPoint presentations that Grimes had prepared in order to pitch Cardlytics to potential investors.  (Docket Entry # 36-4, pp. 8-9).  In an email dated December 9, 2009, Evans asked Grimes and Laube for payment of an invoice for $65,109.81 sent to Cardlytics on August 27, 2008, under the terms of the consulting

agreement.  (Docket Entry # 36-5, p. 8).  The same email also asked for the necessary paperwork regarding Evans' Cardlytics shares under the advisory agreement.  (Docket Entry # 36-5, p. 8).  Grimes replied, "You are correct on the advisory agreement and I believe I have the paperwork here on my desk and ready to go."  (Docket Entry # 36-5, p. 7).

Nevertheless, Grimes disagreed with the consulting aspects of the August 27, 2008 invoice.  In the December 9, 2009 email he stated that, "Last summer, I think we discussed that I felt the consulting bill was significantly over-stated for the work provided.  You guys absolutely did work for us and should be paid but I think we need to discuss the specifics."  (Docket Entry # 36-5, p. 7).  On April 16, 2010, Evans emailed Laube requesting payment on the $65,109.81 consulting invoice as well as his shares under the advisory board agreement.  (Docket Entry # 36-5, p. 10).  Grimes replied that day writing, "while you absolutely did a good deal of consulting for us, I struggled with was it really 66 hours of work.  Also the $800 an hour came as a surprise.  At least the agreement I have on file didn't have a rate."  (Docket Entry # 36-5, p. 9).  Evans further replied that, "at this point I'm not interested in negotiating the Invoice which is from a long time ago.  If you had a problem with it you have plenty of months (years) to raise it.  I'm not going to invest any more time in this."  (Docket Entry # 36-5,

p. 9).  Grimes responded, "please send your copy of the consulting agreement with the rates specified and we will pay you per the contract."  (Docket Entry # 36-5, p. 9).  Grimes testified that he "absolutely wanted to take care of" Evans' shares under the advisory board agreement.  (Docket Entry # 36-3, p. 17).  Nevertheless, when asked, "and then with respect to the invoice, that was not something that you were apologizing for not taking care of?" Grimes testified, "correct."  (Docket Entry # 36-3, p. 17).

Evans testified that in February 2011, after repeated attempts by his counsel, he received stock option paperwork for his shares due under the advisory board agreement.  (Docket Entry # 36-1, ¶ 10).  Evans exercised his option on March 7, 2011 ("stock exercise agreement").  (Docket Entry # 36-4, p. 15) (Docket Entry # 30-6).  On April 29, 2011, Laube and Kristin D. Koepenick ("Koepenick") signed a stock certificate, certifying Evans as the record holder of 141,480 shares of Cardlytics stock.  (Docket Entry # 30-8).  Evans was not notified of this certification until a July 26, 2011 letter from Koepenick ("Koepenick letter").  (Docket Entry # 30-7).

On May 10, 2011, Grimes sent an email to MPD's counsel. (Docket Entry # 36-5, p. 11).  The email states in pertinent part:

- We never executed the final consulting agreement with Market Platform Dynamics.
- In addition, we never agreed on a consulting rate. Mr. Evans arbitrarily billed us at an $800/rate. Furthermore, the draft agreement specified that a project never exceed 20 hours without written permission.
- Efforts made by Mr. Evans during our initial fund raising were consistent with his responsibilities as an advisor to the company. The grant of stock options we made to Mr. Evans is a significant amount of equity in Cardlytics and fairly compensates Mr. Evans and Market Platform Dynamics for all of their efforts as an advisor.
- Until this matter is resolved, we will retain the share certificates.

(Docket Entry # 36-5, p. 11) (punctuation in original). Grimes testified that the phrase, "never executed the final consulting agreement," did not refer to the lack of a signed document but rather that MPD and defendants "just never even agreed on a consulting project." (Docket Entry # 36-3, p. 18).

The Koepenick letter states that Evans became the record and legal owner of his shares in Cardlytics upon completion of the March 7, 2011 stock exercise agreement despite the fact that Cardlytics did not send a formal stock certificate until July. (Docket Entry # 30-7). Evans ultimately received the 141,480 shares due to him under the advisory board agreement. (Docket Entry # 30-1, p. 14).

<u>DISCUSSION</u>

Defendants seek summary judgment on Count Two of the amended complaint. (Docket Entry ## 12 & 30). Defendants

submit that the implied covenant of good faith and fair dealing relates only to the manner of performance of a contract. (Docket Entry # 41).  Defendants assert that by failing to perform entirely, through non-payment to MPD, defendants may have breached a contract but have not breached the implied covenant.  (Docket Entry # 41, p. 2).  Defendants also argue that the breach of the implied covenant of good faith and fair dealing claim is duplicative of the breach of contract claim and therefore subject to dismissal.  (Docket Entry # 41).

In opposing the motion, plaintiff cites three manners of performance through which defendants breached the implied covenant.  (Docket Entry # 36).  First, plaintiff asserts that defendants shifted positions as to whether MPD had performed any work under the consulting agreement.  (Docket Entry # 36, p. 15).  Second, plaintiff argues that defendants withheld shares due to Evans under the advisory board agreement in order to "pressure MPD to drop its claim" under the consulting agreement. (Docket Entry # 36, p. 15).  Third, plaintiff submits that defendants' repeated refusal to accept MPD's $800 hourly consulting rate constitutes a breach of good faith.  (Docket Entry # 36, p. 16).  The viability of the first alleged breach of the implied covenant obviates the need to address the second and third alleged means under which defendants purportedly breached the covenant.

I.  Implied Covenant of Good Faith and Fair Dealing

    Massachusetts law implies a covenant of good faith and fair dealing into every contract.  See FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d 93, 100 (1st Cir. 2009).  The covenant requires that the parties not "'do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  Nile v. Nile, 734 N.E.2d 1153, 1160 (Mass. 2000).  Nevertheless, "'the scope of the covenant is only as broad as the contract that governs the particular relationship.'"  FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d at 100; Chokel v. Genzyme Corporation, 867 N.E.2d 325, 329 (Mass. 2007).  Hence, the covenant does not supply terms to the contract "'that the parties were free to negotiate, but did not, nor does it "create rights and duties not otherwise provided" for in the contract.'"  FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d at 100; Chokel v. Genzyme Corporation, 867 N.E.2d at 329 (same).

    Defendants move for partial summary judgment on the ground that the breach of the implied covenant of good faith and fair dealing claim is duplicative of the breach of contract claim.  (Docket Entry # 31, p. 11).  According to defendants, the claims are duplicative because the only fact unique to the breach of the implied covenant claim (as opposed to the breach of contract claim) is the May 10, 2011 email from Grimes to plaintiff's

13

attorney.  (Docket Entry # 41, p.3) (Docket Entry # 36-5, p.
11).  In that email, Grimes wrote that he would "retain the
share certificates" owed to Evans under the advisory board
agreement until the parties resolved what, if anything,
Cardlytics owed MPD under the consulting agreement.  (Docket
Entry # 36-5, p. 11).

     Defendants correctly note that the implied covenant does
not "create rights or impose duties not otherwise provided for"
in the consulting agreement.  Ayash v. Dana-Farber Cancer Inst.,
822 N.E.2d 667, 684 (Mass. 2005); see also FAMM Steel, Inc. v.
Sovereign Bank, 571 F.3d at 100 (same).  Defendants argue that
because the consulting agreement (Docket Entry # 30-9) and the
advisory board agreement (Docket Entry # 30-4) are two separate
and distinct agreements, MPD cannot claim that defendants
breached the implied covenant of the consulting agreement by
allegedly withholding shares owed to Evans under the separate
and distinct advisory board agreement.  (Docket Entry # 41, p.
3).

     This court agrees with defendants that imposing duties owed
under the advisory board agreement into the consulting agreement
would broaden the consulting agreement beyond what the contract
contemplated.  See FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d
at 100.  The parties were free to negotiate terms to connect the
consulting agreement to the advisory board agreement but they

did not.  (Docket Entry ## 30-4 & 30-9).  Thus, any attempt to impute the obligations of the advisory board agreement into the consulting agreement as a breach of the consulting agreement goes beyond the scope of the implied covenant of good faith and fair dealing.  FAMM Steel, Inc. v. Sovereign Bank, 571 F.3d at 100; Chokel v. Genzyme Corporation, 867 N.E.2d at 329.  Evans is not a party to the consulting agreement nor is he a party to this lawsuit.  (Docket Entry ## 12 & 30-9).  Therefore, whether defendants actually withheld Evans' stock certificates from Evans in violation of the advisory board agreement does not establish a breach of the implied covenant in the consulting agreement.  It is the obligations and duties under the consulting agreement that are at issue in Count Two.  See Chokel v. Genzyme Corporation, 867 N.E.2d at 329.

Defendants' argument that Count Two is duplicative of Count One however does not provide a basis for partial summary judgment on Count Two.  As explained below, Count Two sufficiently alleges a separate breach based on the manner in which Cardlytics performed the consulting agreement.  Thus, even assuming for purposes of argument only that duplication provides a basis for summary judgment, it is not appropriate under the facts of the case at bar.

Next, defendants argue that Cardlytics could not have breached the implied covenant of the consulting agreement

because Cardlytics did not perform its obligation (payment) at all. (Docket Entry # 31, p. 12). "The duty of good faith and fair dealing concerns the manner of performance" of the contract. Uno Restaurants v. Boston Kenmore Realty, 805 N.E.2d 957, 964 (Mass. 2004). Thus, when performing the obligations of the contract, the parties must "'remain faithful to the intended and agreed expectations' of the contract." Chokel v. Genzyme Corporation, 867 N.E.2d at 329.

Defendants maintain that Count Two of the amended complaint is improper because, as they correctly note, the duty of good faith and fair dealing "applies only to conduct during performance of the contract . . .." Accusoft Corp. v. Palo, 237 F.3d 31, 45 (1st Cir. 2001). According to defendants, because Cardlytics did not perform (tender payment), it could not have breached the implied covenant through any manner of performance. (Docket Entry # 31, p. 12). They also attempt to equate the breach of contract claim with the breach of the implied covenant claim. Defendants rely heavily on case law stating that an implied covenant claim can fail as a matter of law where it merely repeats the allegations in a corresponding breach of contract claim. See Brand Group Int'l, LLC v. Established Brands Int'l, Inc., 2011 WL 3236078, at *3 (D.Mass. July 26, 2011) (motion to dismiss implied covenant claim allowed where

plaintiff failed to plead that "promises and representations were false or made with a lack of good faith").

In order to survive partial summary judgment, plaintiff must make "additional factual allegations" that support the claim that defendants' failure to perform exhibited a lack of good faith.  Id.  It is also true that, "[W]hile every breach of contract has the effect of destroying or injuring the rights of the other party to receive its fruits, not every breach of contract is a breach of the implied covenant of good faith and fair dealing."  Christensen v. Kingston Sch. Comm., 360 F.Supp.2d 212, 229 (D.Mass. 2005) (internal quotations omitted). Furthermore, "[H]arms suffered in a breach of the implied covenant of good faith and fair dealing generally involve deceit or 'unfair subterfuge' and usually are 'compounded by deceptive or unfair behavior that prevented—or at a minimum diverted—the injured parties from seeking immediate redress.'"  Christensen v. Kingston Sch. Comm., 360 F.Supp. at 226 (quoting Boston Pilots v. Motor Vessel Midnight Gambler and E. Coast Excursions, Inc., 357 F.3d 129, 135 (1st Cir. 2004)).

Plaintiff asserts that a breach of the implied covenant usually involves bad faith "implicating a dishonest purpose, consciousness of wrong, or ill will in the nature of the fraud." Targus Group Int'l, Inc. v. Sherman, 922 N.E.2d 841, 853 (Mass.App.Ct. 2010).  There is, however, no requirement that the

plaintiff show bad faith on the part of the breaching party.
See Nile v. Nile, 734 N.E.2d at 1160 ("[t]here is no requirement
that bad faith be shown").  Rather, "A plaintiff must show a
lack of good faith," Uno Restaurants v. Boston Kenmore Realty,
805 N.E.2d at 964 n.5, which may be inferred by the evidence.
See Nile v. Nile, 734 N.E.2d at 1160 ("showing of a lack of good
faith is required in these circumstances, but it may be inferred
by evidence").

A.    Alleged Acts of Bad Faith

        Plaintiff has submitted sufficient evidence that a
reasonable jury could find in its favor that defendants breached
the implied covenant by changing positions as to whether MPD
performed any work under the consulting agreement.  Accordingly,
defendants' motion for partial summary judgment on Count Two
must be denied.  American Steel Erectors, Inc. v. Local Union
No. 7, International Association of Bridge, Structural,
Ornamental & Reinforcing Iron Workers, 536 F.3d at 75.  In a
December 9, 2009 email Grimes wrote, "you guys absolutely did
work for us and should be paid."  (Docket Entry # 36-5, p. 7).
On April 16, 2010, Grimes emailed Evans in response to the
inquiry requesting payment of the $65,109.81 invoice:  "[S]orry
for not taking care of it sooner – completely my fault . . . you
absolutely did a good deal of consulting for us."  (Docket Entry

# 36-5, p. 9).  On May 10, 2011, however, Grimes sent the email

to plaintiff's counsel stating inter alia:

> Efforts made by Mr. Evans during our initial fund raising
> were consistent with his responsibilities as an advisor to
> the company.  The grant of stock options we made to Mr.
> Evans is a significant amount of equity in Cardlytics and
> fairly compensates Mr. Evans and Market Platform Dynamics
> for all of their efforts as an advisor.

(Docket Entry # 36-5, p. 11).

The record further supports a finding that in the manner of

performing the consulting agreement defendants initially took

the position that MPD performed work under the agreement and

thereafter adhered to a contrary position that MPD did not

perform any work under the consulting agreement.  Evans

testified that from May into June of 2008 he and Grimes were in

frequent communication:  "[H]e knew I was working on this [under

Schedule C of the consulting agreement], and he knew that

McLernon and Kaiser had been recruited for it."  (Docket Entry #

30-1, p. 22).  Furthermore, "[H]e knew I was working with

McLernon and Kaiser.  He was given results from the project."

(Docket Entry # 30-1, p. 22).  Evans also testified that MPD

compiled data into a spreadsheet with John Kaiser based on a

questionnaire developed by Evans.  (Docket Entry # 30-1, pp. 24-

25).  Evans testified that this information was related to

schedule C of the consulting agreement, specifically sections

3.1.1 through 3.1.3.  (Docket Entry # 30-1, p. 25).

In contrast, Grimes testified that MPD did not perform consulting work for Cardlytics. (Docket Entry # 30-5, pp. 7-8). Plaintiff alleges that the May 16, 2008 email, where Grimes asked Evans when Evans "will have the ad data compiled," shows that Grimes solicited consulting work from MPD. (Docket Entry # 36-5, p. 6). In the opposition to the motion, plaintiff claims that this email supports the assertion that "the work was being performed between April and August of 2008, and Cardlytics clearly knew it was being performed." (Docket Entry # 36, p. 8). Nevertheless, Grimes testified that he wanted "ad data" to use as a reference in regard to Cardlytics' pricing model: "I asked Dave [Evans] if he could go where he thought these different prices were just on a spreadsheet or something for me, which I never got." (Docket Entry # 36-3, p. 14). When asked, "[I]s it your position that no work ultimately was ever done under this consulting agreement," Grimes testified, "that is my position that no work was ever done on this; nor did we ever receive any end product." (Docket Entry # 30-5, pp. 7-8). Evans further testified that some of his work, specifically on behavioral targeting, was copied and pasted from a Wikipedia page. (Docket Entry # 30-1, pp. 26-27).

In light of these discrepancies, there is a genuine issue of material fact as to whether MPD performed any consulting work. Based on the information in the record, a reasonable jury

could find that defendants acted in bad faith by claiming that
plaintiff had not done any consulting work under the consulting
agreement.  Plaintiff submitted sufficient evidence to allow a
jury to infer that Grimes changed his position from "you guys
absolutely did work for us and should be paid" (Docket Entry #
36, p. 9) to claiming that MPD never performed any consulting
work in an attempt to deprive MPD of the fruits of the contract.
See Nile v. Nile, 734 N.E.2d at 1160 ("showing of a lack of good
faith is required in these circumstances, but it may be inferred
by evidence").  A reasonable jury could find that Grimes changed
from arguing the number of hours MPD billed (Docket Entry # 36-
5, p. 7) to claiming that MPD did no work in an attempt to avoid
all payment (Docket Entry # 36-5, p. 11) thereby depriving MPD
of the "fruits of the contract."  Nile v. Nile, 734 N.E.2d at
1160.  If defendants reassured MPD that MPD had performed
consulting work, then subsequently denied that MPD had
performed, defendants may have actively interfered with MPD's
right to collect payment under the contract.  See Christensen v.
Kingston Sch. Comm., 360 F.Supp. at 226.  Summary judgment of
Count Two is therefore improper.

CONCLUSION

Accordingly, the motion for partial summary judgment (Docket Entry # 30) is **DENIED**.  This court will conduct a status conference on August 14, 2013, at 2:30 p.m. to set a trial date.


    /s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge